IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **PRESTWICK CAPITAL MANAGEMENT LTD., PRESTWICK CAPITAL MANAGEMENT 2 LTD., and PRESTWICK CAPITAL MANAGEMENT 3 LTD.,** | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 10 C 23 |
| v. | ) ) ) | |
| **PEREGRINE FINANCIAL GROUP, INC., ACUVEST INC., JOHN LOUIS CAIAZZO, and PHILIP FRANCIS GREY,** | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Prestwick Capital Management Ltd., Prestwick Capital Management 2 Ltd., and Prestwick Capital Management 3 Ltd. (together, "Prestwick"), sued Acuvest Inc. ("Acuvest") and certain of its principals for commodities fraud under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, et seq. According to Prestwick, Acuvest acted as an introducing broker ("IB") for an account opened with Peregrine Financial Group, Inc. ("PFG") in June 2005. Prestwick alleges that Acuvest engaged in unauthorized trading in the account, resulting in losses of roughly $4 million. In addition to its claims against Acuvest, Prestwick seeks to hold PFG liable for Acuvest's alleged fraud by virtue of a guarantee agreement between PFG and Acuvest. PFG has moved for summary judgment, arguing that the guarantee agreement was not effective at

the time Acuvest's fraudulent activity allegedly took place. For the reasons discussed below, the motion is granted.

I.

Summary judgment is proper where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence, and all reasonable inferences therefrom, must be considered in the light most favorable to the non-moving party. *E.g.*, *Miller v. Illinois Dept. of Transp.*, 643 F.3d 190, 192 (7th Cir. 2011).

The dispute between Prestwick and PFG turns almost entirely on the following provision of the guarantee agreement executed by PFG and Acuvest in 2004 ("the 2004 agreement"):

> PFG guarantees performance by the IB [introducing broker] of, and shall be jointly and severally liable for, all obligations of the IB under the Commodity Exchange Act ("CEA"), as it may be amended from time to time, and the rules, regulations, and orders which have been or may be promulgated thereunder with respect to the solicitation of and transactions involving all commodity customer, option customer, foreign futures customer, and foreign options customer accounts of the IB entered into on or after the effective date of this agreement.

There is no dispute that, under this provision, PFG assumed liability for fraudulent conduct engaged in by Acuvest. However, PFG argues that the 2004 agreement was later terminated and superseded by a second agreement in 2006 ("the 2006 agreement"). Under the 2006 agreement, Acuvest acted as an independent introducing broker, and its obligations were no longer guaranteed

by PFG. The 2006 agreement was itself subsequently replaced by a second guarantee agreement in 2008 ("the 2008 agreement"), under which PFG once again agreed to guarantee the performance of Acuvest's obligations. Since Acuvest's alleged unauthorized trading took place in 2007 -- when neither the 2004 nor the 2008 guarantee agreement was effective -- PFG argues that it is not liable for any alleged fraud on Acuvest's part.

Prestwick does not dispute that the alleged fraud took place in 2007. Instead, it contests PFG's contention that PFG's obligations under the 2004 agreement were terminated when PFG and Acuvest entered into the 2006 agreement. As Prestwick sees it, the above-quoted provision from the 2004 agreement reads as follows: "PFG . . . shall be jointly and severally liable for . . . all obligations of the IB under the Commodity Exchange Act . . . with respect to the solicitation of and transactions involving all . . . customer accounts of the IB entered into on or after the effective date of this agreement." In other words, on Prestwick's view, PFG is liable for Acuvest's actions with respect to customer accounts that, like Prestwick's, were opened while the 2004 agreement was in place. So long as the account was opened while the 2004 agreement was effective, PFG's liability as guarantor persists, even with respect to conduct occurring after the agreement was terminated.

This interpretation of the 2004 agreement is untenable. Under

Prestwick's view, guarantee agreements would saddle futures commission merchants ("FMCs") such as PFG with perpetual liability for actions of introducing brokers such as Acuvest. According to Prestwick, the only way PFG could have terminated liability for Accuvest's conduct would have been to close the accounts opened while the 2004 agreement was in place and to give investors the opportunity to open new accounts. There is no basis for thinking that the CEA or its attendant regulations require such an onerous and cumbersome procedure merely in order to terminate a guarantee agreement. Prestwick insists that opening and closing accounts in this fashion is "common practice in the commodities industry," Resp. at 8, but it marshals no convincing evidence in support of this claim. Prestwick merely cites -- without even so much as a parenthetical explanation -- two interpretative letters issued by the Commodity Futures Trading Commission ("CFTC") in 1994. Putting to one side questions concerning the degree of deference that such sources should be accorded, the letters are inapposite. Neither letter suggests that it is common practice for FCMs such as PFG to close and reopen customer accounts after terminating a guarantee agreement with an IB. Rather, the letters address questions concerning the handling of customer accounts when an IB terminates a guarantee agreement with one FCM and enters into a guarantee agreement with another.

Other arguments Prestwick advances for its interpretation are

equally unsupportable. For example, Prestwick seeks to bolster its position by appealing to the final provision of the 2004 agreement, which states that "[t]ermination of this Agreement will not affect the liability of PFG with respect to obligations of the IB incurred on or before the date . . . this Agreement is terminated." Construed most naturally, this clause simply states that termination of the agreement would not absolve PFG of liability resulting from fraudulent activity committed by Acuvest prior to termination. As already indicated, however, Acuvest's alleged fraud took place after the 2006 agreement had superseded and terminated the 2004 agreement. Hence, prior to the 2004 agreement's termination, Acuvest had incurred no obligations for which PFG could be held liable. Prestwick does not explain why it believes its view is supported in any way by this provision. It merely asserts: "[s]ince the subject account in which Plaintiffs' funds were lost was opened before the effective date of the termination, the 2004 Guarantee Agreement covered all transactions in that account until that account is closed, which . . . happened, if at all, [only] well after Plaintiffs' funds were lost in unauthorized trading." Resp. at 8. This is a restatement of Prestwick's position, not an argument in support of it.

Equally untenable is Prestwick's argument that the 2006 agreement did not, in fact, terminate or replace the 2004 agreement. Here, Prestwick cites the 2006 agreement's definition

of "customer" as "a natural person or other entity referred to PFG by IB for the purpose of opening a new Futures Investments brokerage account with PFG or transferring an existing Futures Investments brokerage account *to PFG from another FCM*." Resp. at 9 (quoting 2006 Agreement at 1) (Prestwick's emphasis). According to Prestwick, "the 2006 IIB Agreement *excludes* customers with existing accounts at PFG," so that "the 2004 Guarantee Agreement continued to govern old, continuing accounts, and the 2006 IIB Agreement covered new accounts." *Id.* This argument simply does not follow: the fact that the 2006 agreement covered new accounts does not mean that the 2004 agreement was not terminated. On the contrary, the 2006 agreement unequivocally states: "[t]his Agreement supersedes and replaces any and all previous agreements between IB [Acuvest] and PFG." 2006 Peregrine Financial Group, Inc. Clearing Agreement for Independent Introducing Broker (Doc. 148-2) at 13, Ex. B to Decl. Susan O'Meara. It is difficult to imagine a clearer way in which the parties could have terminated the 2004 agreement.

Prestwick warns that PFG's position run contrary to Congress's intent in passing the CEA. "Applying PFG's interpretation," Prestwick claims, "an FCM such as PFG can send armies of disreputable IBs into the market to amass as many investors as they can with the cloak of the FCM's guarantee and the guarantee can simply be terminated a day after the accounts are secured." Resp.

at 6. According to Prestwick, "[i]t is contrary to the CFTC's intent . . . to allow introducing brokers to lure customers to an FCM with the promise of the security of the guarantee agreement by an FCM and then terminate the guarantee once the customer has opened an account and the customer's only recourse is against a judgment-proof IB." Resp. at 11.

But the CFTC has promulgated regulations designed to address the problem of judgment-proof IBs. Specifically, CFTC regulations require introducing brokers to meet certain net capitalization requirements (unless they have a guarantee agreement with an FCM). 17 C.F.R. § 1.17(a)(1)(iii) - (a)(3) ("[E]ach person registered as an introducing broker must maintain adjusted net capital equal to or in excess of the greatest of: (A) $45,000 [or] (B) The amount of adjusted net capital required by a registered futures association of which it is a member."); *see also First American Discount Corp. v. Commodity Futures Trading Com'n*, 222 F.3d 1008, 1013 (D.C. Cir. 2000). Under CFTC regulations, if an IB cannot meet the capitalization requirements and does not have a guarantee agreement with an FCM, it is required immediately to cease doing business. 17 C.F.R. § 1.17(a)(5). These regulations may not have prevented the alleged fraud perpetrated against Prestwick here. But if so, the problem is endemic to the CEA and must be addressed by Congress or the CFTC; it is not appropriately resolved by asking courts to impose plainly unreasonable constructions on agreements like the

one at issue here.

Prestwick's final argument adverts to the doctrine of equitable estoppel. As Illinois courts have explained, equitable estoppel provides that "[a]n individual may be precluded by his act or conduct from asserting a right that he may otherwise have where his statements or conduct induces another to do something that he would otherwise not have done but for the statements or conduct of the other." *Baldwin v. Wolff*, 690 N.E.2d 632, 635 (Ill. App. Ct. 1998). "In order to establish equitable estoppel, the party claiming it must demonstrate: (1) that the other party misrepresented or concealed material facts; (2) that the other party knew at the time that he or she made the representations that they were untrue; (3) that the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) that the other person intended the party claiming estoppel would act upon the representations; (5) that the party claiming estoppel reasonably relied on the representations to his or her detriment; and (6) that the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person were allowed to deny the truth thereof." *Maniez v. Citibank*, F.S.B., 937 N.E.2d 237, 24 (Ill. App. Ct. 2010).

Prestwick claims that "PFG affirmatively represented, and knew that Acuvest represented to prospective commodities investors, that Acuvest was guaranteed by PFG, a much larger financial institution."

-8-

Resp. at 12. Even if this is true, however, it is not clear why it should warrant the application of equitable estoppel against PFG. After all, PFG did act as Acuvest's guarantor while the 2004 agreement was in effect. During this period, therefore, any representations that Acuvest was guaranteed by PFG would have been entirely legitimate. Prestwick fails to make clear precisely when the alleged misrepresentations were made. Moreover, while Prestwick asserts that PFG "affirmatively represented" that it was Acuvest's guarantor, it does not explain the nature of the representations. Prestwick cites *Integrated Cards, L.L.C. v. McKillip Indus., Inc.*, No. 06-C-2071, 2008 WL 3286981, at *6 (N.D. Ill. Aug. 8, 2008), for the proposition that a court may look "to parties' course of conduct in analyzing equitable estoppel claim." Resp. at 12. This suggests that Prestwick's complaint has to do with representations implied in PFG's actions rather than any express statements made by PFG. But Prestwick never identifies these alleged non-verbal, affirmative representations.

Prestwick does argue that PFG never took any steps to inform Prestwick that the guarantee agreement with Acuvest had been terminated. But such silence would not constitute an affirmative representation. And while Illinois courts have held that a party's silence can serve as a basis for applying equitable estoppel, *see, e.g.*, *In re County Treasurer and ex Officio County Collector*, 869 N.E.2d 1065, 1083 (Ill. App. Ct. 2007) ("Estoppel may arise from

silence as well as words.") (quotation marks omitted), this rule applies only where the party to be estopped has a duty to disclose information to, or a special relationship with, the party seeking estoppel, *see, e.g.*, *Marks v. Rueben H. Donnelley, Inc.*, 636 N.E.2d 825, 832 (Ill. App. Ct. 1994) ("[E]quitable estoppel cannot be based on a party's silence unless that party had an affirmative duty to speak. This duty may arise where there is a special relationship between the parties."). Prestwick does not allege that any such duty or relationship exists between itself and PFG.

Prestwick requests that it be allowed to take additional discovery pursuant to Fed. R. Civ. P. 56(d)(2) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery."). It asserts that, "[w]ith respect to Plaintiffs' equitable estoppel claim, Plaintiffs do not have facts essential to justify their opposition to PFG's motion due to a lack of discovery." In particular, Prestwick claims that it needs "further discovery into the representations that Acuvest made regarding its status as a Guaranteed IB to Cory Dosdall," Prestwick's manager at the time. Prestwick also says that it needs further discovery regarding its reliance on Acuvest's and PFG's conduct and statements regarding the 2004 Guarantee Agreement." Resp. at 13 (citation omitted). According to Prestwick, additional discovery will show

-10-

that Dosdall was told by Acuvest that Acuvest was guaranteed by PFG; that Dosdall would never have invested in a commodities pool recommended by Acuvest if he had not been told this information; and that Dosdall would have immediately withdrawn Prestwick's funds if he had known that the 2004 Guarantee Agreement had been terminated.

Although I am given pause by PFG's lack of cooperation in the discovery process to date, the fact is that further discovery would ultimately be of no help to Prestwick. For in order to make out a claim for equitable estoppel, Prestwick must show that it relied on representations made *by PFG*. The issues on which Prestwick seeks additional evidence, however, pertain only to representations made by Acuvest. Thus, even if Dosdall were to testify as Prestwick anticipates, Prestwick still would be unable to show that PFG should be equitably estopped from arguing that its guarantee agreement with Acuvest had been terminated. Prestwick's equitable estoppel argument fails, therefore, as does its argument that it should be allowed to take additional discovery under Rule 56(d).

II.

For these reasons, PFG's motion for summary judgment is granted.

ENTER ORDER:

*[signature: Elaine E. Bucklo]*

**Elaine E. Bucklo**
United States District Judge

-11-

Dated: August 25, 2011