In the

# United States Court of Appeals

### For the Seventh Circuit

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 12-1232

PRESTWICK CAPITAL MANAGEMENT, LTD.,
PRESTWICK CAPITAL MANAGEMENT 2, LTD.,
PRESTWICK CAPITAL MANAGEMENT 3, LTD.,

*Plaintiffs-Appellants,*

*v.*

PEREGRINE FINANCIAL GROUP, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-CV-00023—**Elaine E. Bucklo,** *Judge.*

ARGUED JANUARY 24, 2013—DECIDED JULY 19, 2013

Before MANION and WOOD, *Circuit Judges,* and BARKER,
*District Judge.*[*]

BARKER, *District Judge.* Author-*cum*-rabbi Chaim Potok
once observed that life presents "absolutely no guarantee

---

[*] The Honorable Sarah Evans Barker, United States District
Court for the Southern District of Indiana, sitting by designation.

that things will automatically work out to our best advantage."[1] Given the regulatory mandate that certain financial entities guarantee other entities' performance, and acknowledging that guarantees of all sorts can turn out to be ephemeral, we grapple here with the truth of Potok's aphorism. More specifically, the instant lawsuit requires us to clarify the scope of a futures trading "guarantee gone wrong," presenting sunk investments and semantic distractions along the way.

In 2009, Prestwick Capital Management Ltd., Prestwick Capital Management 2 Ltd., and Prestwick Capital Management 3 Ltd. (collectively, "Prestwick") sued Peregrine Financial Group, Inc. ("PFG"), Acuvest Inc., Acuvest Brokers, LLC, and two of Acuvest's principals (John Caiazzo and Philip Grey), alleging violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.* Prestwick asserted a commodities fraud claim against all defendants, a breach of fiduciary duty claim against the Acuvest defendants, and a guarantor liability claim against PFG. After the district court awarded summary judgment to PFG in August 2011, Prestwick moved to dismiss the remaining defendants with prejudice in order to pursue its appeal of right against PFG. The district court subsequently dismissed the Acuvest defendants from the lawsuit, rendering its grant of summary judgment a final order which Prestwick now appeals.

---

[1] CONVERSATIONS WITH CHAIM POTOK 59 (Daniel Walden ed., 1983).

No. 12-1232                                              3

We affirm the district court.[2]

## I. REGULATORY AND STATUTORY BACKGROUND

This commodities fraud lawsuit presents a corpora-
tion's attempt to recoup investments allegedly depleted

---

[2] PFG has also filed a motion to dismiss Prestwick's appeal,
arguing that it is barred by *res judicata*. According to PFG,
Acuvest and its principals are the true "wrongdoers" whose
dismissal from this lawsuit bars further litigation of the
matter. PFG contends that, because releasing a wrongdoer
discharges any entities which may be derivatively liable, PFG
has been implicitly released from this lawsuit. Prestwick
rejoins that the statutory framework of the CEA, not the law of
guarantor liability, controls. Specifically, Prestwick argues, the
purpose of the CEA and its associated rules is to protect
investors from judgment-proof brokers. Prestwick therefore
asserts that this underlying policy goal compels a finding that
PFG remains "on the hook" for the Acuvest defendants' alleged
misconduct. We recognize, as PFG argues, that the CEA does
not provide inviolate guarantees. But the CEA's regulatory
scheme *does* clearly draw distinctions between the nature of the
duties imposed upon guarantors (like PFG) and those
imposed upon brokers (like Acuvest). More fatal to PFG's *res
judicata* argument is the fact that this doctrine does not apply
to orders within the same case. *See, e.g., Bernstein v. Bankert*,
702 F.3d 964, 995 (7th Cir. 2012) (noting that res judicata "bar[s]
a *second* suit in federal court") (emphasis supplied). In any
event, Prestwick appealed the order dismissing Acuvest—an
order which was, we note, devoid of a finding that Acuvest
was not liable in PFG's settlement with Acuvest. For these
reasons, we DENY PFG's motion to dismiss Prestwick's appeal.

during commerce involving an underfunded trading pool. In this financial setting, parties commonly attempt to shift price risk by signing futures contracts. Briefly stated, a futures contract is an agreement involving a promise to purchase or sell a particular commodity at a fixed date in the future. *See Lachmund v. ADM Inv. Servs., Inc.*, 191 F.3d 777, 786 (7th Cir. 1999). We have previously described the operative promise of such agreements as "fungible" because it employs standard terms and engages clearing brokers to guarantee the parties' respective obligations. *Chi. Mercantile Exch. v. S.E.C.*, 883 F.2d 537, 542 (7th Cir. 1989). "Trading occurs in 'the contract', not in the commodity," and takes place on the futures exchange, a market meticulously defined and governed by the CEA. *Id.*

Enacted in 1936, the CEA regulates transactions unique to the futures industry and forbids fraudulent conduct in connection with these activities. When futures trading expanded in the 1970s, Congress "'overhaul[ed]' the . . . [CEA] in order to institute a more 'comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 836 (1986) (quoting H.R. REP. NO. 93-975, 93d Cong., 2d Sess. at 1 (1974)). Congress contemporaneously created the Commodity Futures Trading Commission ("CFTC"), the regulatory agency charged with administering the CEA and promulgating any rules necessary to implement its new structure. *Geldermann, Inc. v. Commodity Futures Trading Comm'n*, 836 F.2d 310, 312 (7th Cir. 1987) (citing 7 U.S.C. § 12a(5) (1974)). One important aspect of this responsibility is

No. 12-1232                                                 5

the oversight of futures commission merchants ("FCMs"),
which are akin to securities brokerage houses. The CEA
defines FCMs as "individual[s], association[s], part-
nership[s], corporation[s], or trust[s] . . . that [are] engaged
in soliciting or in accepting orders for . . . the purchase
or sale of a commodity for future delivery." 7 U.S.C.
§ 1a(28)(A)(i)(I)(aa)(AA).

    Prior to 1982, it was customary for FCMs to outsource
various projects to independent agents. *See* S. REP. NO. 97-
384, at 40 (1982). The business dealings of these
agents—many of whom were individuals or small busi-
nesses—troubled the CFTC for many reasons which soon
came to the attention of Congress. As the House Commit-
tee on Agriculture noted in its May 17, 1982 report on the
Futures Trading Act of 1982:

> Although agents may perform the same functions as
> branch officers of [FCMs], agents generally are sepa-
> rately owned and run. [FCMs] frequently disavow
> any responsibility for sales abuses or other viola-
> tions committed by these agents. The Committee
> believes that the best way to protect the public is to
> create a new and separate registration category for
> "agents" . . . . Activities of agents and those of com-
> modity trading advisors or associated persons of
> [FCMs] may be virtually identical, yet commodity
> trading advisors and such associated persons are
> registered and regulated under the [CEA], while
> many agents are not.

H.R. REP. NO. 97-565(I), at 49 (1982). The CFTC originally
suggested requiring "agents" to register as FCMs' "associ-

ates," but Congress rejected that proposal. On that point, the Senate Committee on Agriculture, Nutrition, and Forestry reported, "[I]t would be inappropriate to (1) require these independent business entities to become branch offices of the [FCMs] through which their trades are cleared or (2) to impose vicarious liability on a [FCM] for the actions of an independent entity." S. REP. NO. 97-384, at 41. Yet Congress could no longer avoid the demand "to guarantee accountability and responsible conduct" of entities that "deal with commodity customers and, thus, have the opportunity to engage in abusive sales practices." *Id.* at 111. This quandary incited new legislation: the Futures Trading Act of 1982, Pub. L. No. 97-444, 96 Stat. 2294 (1983).

One legislative tactic Congress employed to remedy the CEA's perceived shortcomings was to launch a new futures trading entity: the introducing broker ("IB"). Like its "agent" predecessor, the IB was intended to procure customer orders independently, relying on FCMs to retain customer funds and maintain appropriate records. S. REP. NO. 97-384, at 41. This change was discernible in amended § 1a of the CEA, which defines an IB as "any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant) . . . who . . . is engaged in soliciting or in accepting orders for . . . the purchase or sale of any commodity for future delivery." 7 U.S.C. § 1a(31)(A)(i)(I)(aa). To improve IB accountability, the Futures Trading Act of 1982 also supplemented the CEA's registration requirements. The amended CEA provides: "It shall be unlawful for any person to be an

No. 12-1232                                            7

[IB] unless such person shall have registered with the [CFTC] as an [IB]." *Id.* § 6d(g). Registration as an IB is contingent upon the broker's ability to "meet[] such minimum financial requirements as the [CFTC] may by regulation prescribe as necessary to insure his meeting his obligation as a registrant." *Id.* § 6f(b). In a House Conference Report of December 13, 1982, Congress justified these amendments as follows:

> Because many introducing brokers will be small businesses or individuals, as contemplated by the definition of this class of registrant, the conferees contemplate that the [CFTC] will establish financial requirements which will enable this new class of registrant to remain economically viable, although it is intended that fitness tests comparable to those required of associated persons will also be employed. The intent of the conferees is to require commission registration of all persons dealing with the public, but to provide the registrants with substantial flexibility as to the manner and classification of registration.

H.R. REP. NO. 96-964, at 41 (1982) (Conf. Rep.). Pursuant to 7 U.S.C. § 21(*o*), the CFTC has delegated this registration function to the National Futures Association ("NFA"), a private corporation registered as a futures association under the CEA. *See* 7 U.S.C. § 21(j) (discussing requirements for registered futures associations).

In August 1983, the CFTC promulgated a final rule setting forth minimum financial benchmarks for IBs. 48 Fed. Reg. 35,248, 35,249 (Aug. 3, 1983). This, too, was a

compromise; the draft version of the rule would have required IBs, *inter alia*, to maintain a minimum adjusted net capital level of $25,000 and to file monthly financial reports if capital fell to "less than 150 percent of the minimum" amount (the "early warning" requirement). *Id.* at 35,249; *see also* 48 Fed. Reg. 14,933, 14,934, 14,945 (Apr. 6, 1983) (original version of rule). After the notice and comment period, the CFTC reduced the minimum adjusted net capital requirement to $20,000 and permitted IBs to credit toward this balance 50 percent of guarantee or security deposits maintained with FCMs.[3] 48 Fed. Reg. at 35,249. The current requisite minimum adjusted net capital is $45,000 or "[t]he amount of adjusted net capital required by a registered futures association of which [an IB] is a member." 17 C.F.R. § 1.17(a)(1)(iii)(A)-(B). Each IB must annually report its net capital position on CFTC Form 1-FR-IB. *Id.* § 1.10(b)(2)(ii)(A). However, an IB "shall be deemed to meet the adjusted net capital requirement" if it is a party to a binding guarantee agreement[4] satisfying the conditions outlined in 17 C.F.R. § 1.10(j). *Id.* § 1.17(a)(2)(ii). A guaranteed IB, in other words, is not subject to the same reporting requirements imposed on an IB that has assumed an independent status. According to the CFTC, this dispensation is appropriate because "the guarantee agreement

---

[3] "Taken together, these changes effectively reduce[d] the required capital level for [IBs] by nearly 45 percent." 48 Fed. Reg. at 35,249.

[4] A definition of the term "guarantee agreement" appears at 17 C.F.R. § 1.3(nn).

provides that the FCM . . . will guarantee performance by the [IB] of its obligations under the Act and the rules, regulations, and order thereunder. . . . [and] is an alternative means for an [IB] to satisfy the [CFTC's] standards of financial responsibility." 48 Fed. Reg. at 35,249.

## II. FACTS

In the case before us, the plaintiff, Prestwick, is a conglomerate of Canadian investment companies operating primarily out of Chestermere, Alberta. The defendant, PFG, is an Iowa corporation with its principal place of business in Chicago, Illinois; it also conducts business in New York as an active foreign corporation. Importantly, PFG is registered with the CFTC as an FCM that guarantees compliance with the CEA by certain registered IBs, including two of the Acuvest defendants (Acuvest Inc. and Acuvest Brokers, LLC). Acuvest Inc. is a Delaware corporation with its principal place of business in Temecula, California; Acuvest Brokers, LLC, a branch of Acuvest Inc., is a New York corporation with its principal place of business in the State of New York. Caiazzo and Grey, the remaining Acuvest defendants, are Acuvest Inc. executives who have registered with the NFA in personal capacities.

In 2004, pursuant to the CFTC regulations discussed *supra*, Acuvest and PFG executed a guarantee agreement ("the 2004 Guarantee Agreement"). *See* 17 C.F.R. § 1.3(nn). The portion of their 2004 Guarantee Agreement that is the focus of this lawsuit provided, in relevant part, as follows:

> PFG guarantees performance by [Acuvest] . . . of, and shall be jointly and severally liable for, all obligations of the IB under the Commodity Exchange Act ("CEA"), as it may be amended from time to time, and the rules, regulations, and orders which have been or may be promulgated thereunder with respect to the solicitation of and transactions involving all commodity customer, option customer, foreign futures customer, and foreign options customer accounts of the IB entered into on or after the effective date of this Agreement.

Thus, the arrangement between PFG and Acuvest contemplated (1) Acuvest's solicitation of customers and subsequent engagement with customers for business dealings, and (2) PFG's willingness to assure Acuvest's customers that Acuvest would conform its conduct to the mandates of the CEA. Further, as the district court noted, this provision made PFG responsible for any fraudulent conduct engaged in by Acuvest.

Two years later, PFG's compliance director, Susan O'Meara, sent a memorandum to the NFA to inform the NFA of a change in PFG's relationship with Acuvest. This correspondence, titled "Guaranteed IB Termination," was dated August 25, 2006 and advised, "As of August 24, 2006, [PFG] will terminate its guarantee agreement with Acuvest . . . . This termination has been done by mutual consent."

Acuvest and PFG executed an agreement of a slightly different nature the very same month—a "Clearing Agreement for Independent Introducing Broker" ("the 2006 IIB

Agreement"). Section 25 of the 2006 IIB Agreement stated that this contract "supersede[d] and replace[d] any and all previous agreements between [Acuvest] and PFG." Under the new arrangement, PFG agreed to "execute[,] buy[,] and sell orders and perform settlement and accounting services for and on behalf of [c]ustomers introduced by [Acuvest]." PFG's other obligations under this Agreement pertained to customers and included preparing activity reports, mailing account statements, distributing payments, conducting "all cashiering functions," and maintaining records. Acuvest, by contrast, assumed significantly more responsibilities to PFG and its customers. Notably, Acuvest's signature on the 2006 IIB Agreement evinced its consent to:

> comply with the rules and regulations of all relevant regulatory entities, exchanges[,] and self-regulatory organizations related to the purchase and sale of [f]utures [i]nvestments . . . . [Acuvest] shall use its best efforts to assure that [a] [c]ustomer complies with all applicable position limits established by the CFTC or any contract market. [Acuvest] shall not knowingly permit any transaction to be effected in any [c]ustomer account in violation of such limits. [Acuvest] shall promptly report to PFG any [c]ustomer's [c]ustomer [sic] [a]ccount exceeding any applicable limit.

From a financial perspective, the 2006 IIB Agreement dramatically expanded Acuvest's obligations. This adjustment was consistent with the CFTC's official differentiation between guaranteed and independent IBs: "By enter-

ing into the agreement, the [guaranteed IB] is relieved from the necessity of raising its own capital to satisfy minimum financial requirements. In contrast, an independent [IB] must raise its own capital to meet minimum financial requirements."[5] Here, Acuvest was accountable for all customer losses, charges, and deficiencies, as well as initial and maintenance margin requirements. Acuvest also accepted absolute financial responsibility for its own actions and pledged to indemnify PFG from any harm resulting therefrom. Perhaps the most salient feature of the 2006 IIB Agreement was its treatment of guarantees. As an independent IB, Acuvest was bound by a new indemnification provision: "[Acuvest] guarantees all the financial obligations of the [c]ustomer accounts of [c]ustomers serviced by [Acuvest] and/or carried on the equity run reports produced by PFG for [Acuvest]."

PFG and Acuvest altered the nature of their relationship again on July 3, 2008 by entering into yet another agreement ("the 2008 Guarantee Agreement"). As was true of the 2006 IIB Agreement, this contract superseded all previous agreements between Acuvest and PFG. However, the new arrangement restored Acuvest to its prior status as a guaranteed IB. The provision in which PFG guaranteed Acuvest's obligations involving "customer accounts of [Acuvest] entered into on or

---

[5] U.S. COMMODITY FUTURES TRADING COMM'N, CFTC GLOSSARY, http://www.cftc.gov/consumerprotection/educationcenter/cftc glossary/glossary_g (last visited July 15, 2013).

No. 12-1232                                    13

after the effective date of th[e] Agreement" was specified by regulation and, therefore, identical to the text cited *supra* from the 2004 Guarantee Agreement. *See* 17 C.F.R. § 1.3(nn) (requiring guarantee text from CFTC Form 1-FR-IB Part B).

Acuvest's role as an IB eventually intersected with Prestwick. The Acuvest-Prestwick business relationship arose when Acuvest advised Prestwick to become a limited partner in Maxie Partners L.P. ("Maxie"), a New York commodity trading pool registered with the NFA as an "Exempt Commodity Trading Advisor."[6] For purposes of the instant litigation, Acuvest was the IB for all of Maxie's accounts. Prestwick elected to join the Maxie trading pool and invested approximately $7,000,000 in that fund between 2005 and 2006. During this time period, the Acuvest defendants assumed full responsibility for Maxie's management and investment decisions regarding the account holding Prestwick's funds and maintained open lines of communication with Prestwick.

In April 2007, Prestwick informed Grey (one of Acuvest's executive vice presidents) of its intent to redeem Prestwick's limited partnership interest in Maxie. Grey transmitted Prestwick's redemption notice

---

[6] Maxie also provides investment advice through an agreement with New York corporation Winell Associates, Inc. ("Winell"), a commodity pool operator designated as the official investment manager for Maxie's portfolio.

to Winell (the trading pool operator),[7] told Prestwick that an accountant would perform a valuation of its investment in the pool, and indicated that Prestwick's funds would be wired sometime between July 10 and July 15, 2007. Believing that Maxie's assets were valued at approximately $20,000,000, Prestwick was understandably alarmed to learn on August 7, 2007 that much of its $7,000,000 investment in Maxie was unavailable. Prestwick attributes this circumstance to the "losing trading" decisions of Acuvest and Winell in July 2007. Specifically, Prestwick alleges a causal relationship between the pool's significant losses and the redepositing of nearly $4,000,000 of Prestwick's funds in Maxie's PFG account to meet frequent margin call demands. Prestwick avers that Grey, as an agent of Acuvest, knew that none of Prestwick's funds should have been redeposited into the pool's PFG account—especially not for purposes of trading or covering margin calls.

Ultimately, Prestwick's notice of redemption did not generate the anticipated payout. Prestwick claims to have received only two disbursements of its original investment in the pool—one in August 2007, and the other in October 2007—totaling approximately $3,000,000. Despite Prestwick's allegation that Winell provided assurances of forthcoming payments, Prestwick's efforts to collect the remaining balance since October 2007 have been wholly unsuccessful. Prestwick contends that

---

[7] Winell is also a "commodity trading advisor" as defined in the CEA. *See* 7 U.S.C. § 1a(12).

No. 12-1232                                    15

it is presently owed the remainder of its limited partner-
ship interest in Maxie, which is roughly $4,000,000.

Although Prestwick initially filed suit against PFG,
Acuvest, Caiazzo, and Grey in the Southern District of
New York, that action was transferred to the Northern
District of Illinois on the defendants' motion. Prestwick
asserted three causes of action in its complaint: (1) com-
modities pool fraud as to all defendants; (2) breach
of fiduciary duty as to the Acuvest defendants; and
(3) guarantor liability as to PFG. The district court
awarded summary judgment to PFG on August 25, 2011.
Invoking Federal Rule of Civil Procedure 41(a)(2),
Prestwick moved to dismiss its claims with prejudice
against the Acuvest defendants. On December 30, 2011,
the district court granted Prestwick's motion to dismiss.
The case was closed on January 3, 2012, and Prestwick
filed its timely notice of appeal on January 27, 2012.

## III. ANALYSIS

Prestwick raises two issues for our review. The first is
whether termination of PFG's guarantee of Acuvest's
obligations under the CEA also terminated such protection
"for existing accounts opened during the term of the
guarantee," a result Prestwick vehemently repudiates. The
second is whether PFG may be equitably estopped from
arguing that the 2004 Guarantee Agreement was
effectively terminated, which Prestwick contends should
be answered in the affirmative. Because Prestwick's
arguments cannot be harmonized with law or logic, we
reach contrary results on both questions presented and
affirm the entirety of the district court's decision.

At summary judgment, the district court ruled that the 2006 IIB Agreement unequivocally terminated the 2004 Guarantee Agreement with respect to all dealings between Acuvest and PFG. The court clarified that the 2006 IIB Agreement did not extinguish PFG's liability for obligations Acuvest incurred on or before the date on which the 2006 IIB Agreement superseded previous Acuvest-PFG contracts, but that it did absolve PFG of any duty to guarantee obligations incurred by Acuvest beyond that point. Because the alleged fraud claimed by Prestwick occurred in 2007, a date clearly after the 2006 IIB Agreement had taken effect, the court concluded that PFG had no responsibility at that time for securing Acuvest's obligations insofar as they involved Prestwick's limited partnership interest in Maxie. *See Prestwick Capital Mgmt. Ltd. v. Peregrine Fin. Grp., Inc.*, No. 10-C-23, 2011 WL 3796740, at *2 (N.D. Ill. Aug. 25, 2011) ("As already indicated, however, Acuvest's alleged fraud took place after the 2006 agreement had superseded and terminated the 2004 agreement. Hence, prior to the 2004 agreement's termination, Acuvest had incurred no obligation for which PFG could be held liable."). The district court also rejected Prestwick's entreaty to equitably estop PFG from arguing that the 2004 Guarantee Agreement had been terminated, ruling that Prestwick had marshaled no proof of reliance on any representations made by PFG.[8]

---

[8] Prestwick also asked for the opportunity to conduct additional discovery in support of its equitable estoppel argu-

(continued...)

No. 12-1232                                    17

Our review of the district court's decision to grant summary judgment in favor of PFG is *de novo*. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We will affirm the district court if no genuine issue of material fact exists and if judgment for PFG is proper as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To the extent that our analysis pertains to the district court's interpretation of the CEA and its concomitant rules, the standard of review is also *de novo*. *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 876 (7th Cir. 2009). Similarly, we assess the district court's interpretation of unambiguous contracts *de novo* because this inquiry primarily involves reviewing legal conclusions. "If [a] contract is ambiguous, a more deferential standard of review is applied to the interpretation of the terms and factual findings." *EraGen Biosci., Inc. v. Nucleic Acids Licensing LLC*, 540 F.3d 694, 698 (7th Cir. 2008) (citation omitted).

## A.  Termination of the 2004 Guarantee Agreement

Prestwick's challenge to the district court's decision regarding the temporal scope of the 2004 Guarantee Agreement is threefold. First, Prestwick contends that the district court erroneously disregarded the plain contractual language. Prestwick's suggested construc-

───────────────

(...continued)

ment. *See* Fed. R. Civ. P. 56(d). The court rejected this request as well. *Prestwick Capital Mgmt. Ltd.*, 2011 WL 3796740, at *5.

tion of the 2004 Guarantee Agreement would render PFG liable for Acuvest's obligations concerning any account *opened* with PFG "during the term of" that agreement—no matter when any subsequent wrongdoing related to such account occurred. Second, Prestwick accuses the district court of misinterpreting and rewriting the 2006 IIB Agreement when the court concluded that this document, not the 2004 Guarantee Agreement, governed the PFG account containing Prestwick's funds. According to Prestwick, the parties did not intend the 2006 IIB Agreement to end PFG's guarantee of Acuvest's obligations for accounts predating its execution. Third, Prestwick argues that the district court's ruling contravenes significant consumer protection policies underlying the CFTC's regulatory scheme for guaranteed IBs. We respectfully disagree with Prestwick as to all arguments it has advanced on this issue.

Like various other species of contracts, guarantee agreements and IB agreements often reflect the parties' bargained-for preferences, such as the law to be applied in resolving any ensuing disputes. We regularly honor reasonable choice of law provisions in contract lawsuits; in fact, "it is the exceptional circumstance that a federal court, or any court[,] for that matter, will not honor a choice of law stipulation." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (quoting *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998)). Here, seeing no reason to override the choice of law terms in the relevant agreements, we accede to the parties' wishes and apply Illinois law to the facts. Illinois

requires that "meaning and effect . . . be given to every part of [a] contract including all its terms and provisions, so no part is rendered meaningless . . . unless absolutely necessary." *INEOS Polymers Inc. v. BASF Catalysts*, 553 F.3d 491, 500 (7th Cir. 2009) (quoting *Coles-Moultrie Elec. Coop. v. City of Sullivan*, 709 N.E.2d 249, 253 (Ill. App. Ct. 1999)). Undefined contractual terms are typically afforded their plain and ordinary meanings "[u]nless the agreement unequivocally specifies" nuanced connotations, *Frederick v. Prof'l Truck Driver Training Sch., Inc.*, 765 N.E.2d 1143, 1152 (Ill. App. Ct. 2002), and words of art or technical terms are assigned their industrial meanings within the commercial context of the agreement, *Archer-Daniels Midland Co. v. Ill. Commerce Comm'n*, 704 N.E.2d 387, 392 (Ill. 1998) (noting that Illinois follows the approach described in RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(b)). These rules of construction emanate logically from the notion that contracts do not exist in a vacuum. *See id.*

Notwithstanding the foregoing, we have previously cautioned that contract interpretation does not turn on "pure[] semantic[s]." *Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 316 (7th Cir. 2002). On the contrary, we generally presume that a contract's significance must, to a certain extent, be attributed to the parties' intent to bargain for "something sensible." *Id.* (citing *R.I. Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir. 2001)). It is therefore incumbent upon a reviewing court to understand the practical context of the operative contractual language as well. *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). Both Prestwick and PFG have implicitly

20                                          No. 12-1232

conceded as much by advancing policy-based argu-
ments, which we address *infra*.

   First, however, we turn to the practical aspects of termi-
nating a guarantee agreement consistent with the CEA
and its attendant rules and regulations. The CFTC explic-
itly addressed the contours of termination in its final
rule on "Registration and Other Regulatory Require-
ments" for IBs, dated August 3, 1983, as follows:

> If [a] guarantee agreement does not expire or is not
> terminated in accordance with the provisions
> of § 1.10(j) . . . , it shall remain in effect indefinitely. The
> [CFTC] wishes to make clear that the termination of
> a guarantee agreement by an FCM or by an intro-
> ducing broker, or the expiration of such an agree-
> ment, does not relieve any party from any liability or
> obligation arising from acts or omissions which oc-
> curred during the term of the agreement.

48 Fed. Reg. 35,248, 35,265 (citation omitted). This rule
corresponds to Title 17, Section 1.10(j) of the Code of
Federal Regulations, which provides the protocol for
ending a guaranteed IB relationship. Termination of a
guarantee agreement may take place at any time during
its effective term through one of three procedures:

> (i) [b]y mutual written consent of the parties, signed
> by an appropriate person on behalf of each party,
> with prompt written notice thereof, signed by an
> appropriate person on behalf of each party, to the
> Commission and to the designated self-regulatory
> organizations of the [FCM] or retail foreign exchange
> dealer and the [IB];

(ii) [f]or good cause shown, by either party giving written notice of its intention to terminate the agreement, signed by an appropriate person, to the other party to the agreement, to the Commission, and to the designated self-regulatory organizations of the [FCM] or retail foreign exchange dealer and the [IB]; or

(iii) [b]y either party giving written notice of its intention to terminate the agreement, signed by an appropriate person, at least 30 days prior to the proposed termination date, to the other party to the agreement, to the Commission, and to the designated self-regulatory organizations of the [FCM] or retail foreign exchange dealer and the [IB].

17 C.F.R. § 1.10(j)(6).

At the summary judgment stage, the district court firmly rejected Prestwick's contention that the 2004 Guarantee Agreement was never terminated. In point of fact, the court concluded that the signpost of termination was the execution of the 2006 IIB Agreement by Acuvest and PFG. The court was not persuaded by Prestwick's argument that the 2006 IIB Agreement related only to customer accounts *opened* after August 24, 2006 and opined, as we do today, that Prestwick's logic "simply does not follow." *Prestwick Capital Mgmt. Ltd.*, 2011 WL 3796740, at *2. As a matter of law, the district court ruled:

[T]he fact that the 2006 agreement covered new accounts does not mean that the 2004 agreement was not terminated. On the contrary, the 2006 agreement unequivocally states: "[t]his Agreement supersedes and replaces any and all previous agreements

between IB [Acuvest] and PFG." It is difficult to imagine a clearer way in which the parties could have terminated the 2004 agreement.

*Id.* We thoroughly endorse this line of reasoning as well as this conclusion. It is clear that the district court determined, as a matter of law, that PFG and Acuvest terminated the 2004 Guarantee Agreement by the method set forth in 17 C.F.R. § 1.10(j)(6)(i). Mutual written consent of the parties was manifest by the very existence of the 2006 IIB Agreement, which was signed by appropriate representatives from both PFG (Neil Aslin, PFG President) and Acuvest (Caiazzo). Finally, as required by 17 C.F.R. § 1.10(j)(6)(i), the letter and documents provided by Ms. O'Meara (from PFG) and signed by Caiazzo indicate prompt written notice of termination to the NFA ("the designated self-regulatory organization[] of the [FCM]").

Our view that the district court properly heeded the plain language of the 2004 Guarantee Agreement is bolstered by record evidence confirming that the contract was effectively terminated on August 24, 2006, *i.e.*, an authenticated screenshot of information from the NFA's "External Tracking" electronic database.[9] The NFA maintains data repositories like these to log start and end dates of guarantee agreements for registered IBs. This undertaking is critical because "[a]n introducing broker

---

[9]  Docket No. 147-1 (trial record); *see also* Docket No. 146 ¶¶ 19-20 (citing declaration of Thomas Sexton, NFA Senior Vice President).

No. 12-1232                                        23

may not simultaneously be a party to more than one guarantee agreement." 17 C.F.R. § 1.10(j)(8). For PFG, the pertinent data entries are:

| NFA ID | Guarantor Name | Start Date | End Date |
|--------|----------------|------------|----------|
| * * * | | | |
| 0232217 | [PFG] INC | 6/26/2004 | 8/24/2006 |
| 0232217 | [PFG] INC | 7/9/2008 | |

Thus, records of the NFA—the organization vested with IB registration authority—verify PFG's status as Acuvest's designated guarantor from June 26, 2004 until August 24, 2006. The same records demonstrate that between August 24, 2006 and July 8, 2008 (one day prior to the "start date" of the 2008 Guarantee Agreement), Acuvest was not a party to any guarantee agreement with a FCM. Without a legally binding agreement establishing such a relationship, Acuvest was not a guaranteed IB from August 24, 2006 until July 9, 2008. The corollary to this historical recitation must be, and is, that in July 2007, when the misconduct of which Prestwick complains allegedly occurred, Acuvest was not a guaranteed IB.

Nonetheless, according to Prestwick, the foregoing records have no bearing on PFG's contractual duties to Acuvest. Prestwick avers that the "purported" termination of the 2004 Guarantee Agreement pertained only to brand-new accounts opened with PFG on or after August 24,

2006 (the effective date of the 2006 IIB Agreement). Prestwick further advocates that proper construction of the 2004 Guarantee Agreement entails different treatment for new and existing accounts with PFG. As in its opening brief, Prestwick still contends that "[i]f PFG wished to terminate the guarantee as to existing accounts, it could simply close the accounts and re-open them, if the customers wished, in a non-guaranteed status."[10] The trouble with Prestwick's position, however, is that the 2004 Guarantee Agreement imposes no such requirement on PFG, nor does any other regulatory requirement.

As noted *supra*, the essential assurance language of the 2004 Guarantee Agreement tracks the specifications of the Code of Federal Regulations: "PFG guarantees performance by the IB of, and shall be jointly and severally liable for, all obligations of the IB under the [CEA] . . . with respect to the solicitation of and transactions involving . . . customer accounts of the IB entered into on or after the effective date of this Agreement."[11] In advocating its interpretation of the scope of this guarantee, Prestwick directs the court's attention to *Stewart v. GNP Commodities, Inc.*, Nos. 88-C-1896, 91-C-2635, 1992 WL 121545 (N.D. Ill. May 26, 1992), *aff'd in part, rev'd in part sub nom. Cunningham v. Waters Tan & Co.*, 65 F.3d 1351 (7th Cir. 1995). These consolidated actions involved a

---

[10] Appellant Br. at 14.

[11] The ellipses in this reference to the guarantee clause have been inserted only to remove distracting language regarding amendments to the CEA and various types of customer accounts.

No. 12-1232                                          25

guarantee agreement in which FCM Miller assumed
responsibility for IB Dennis Tan's CEA-related obliga-
tions. The operative contract between Miller and Tan
took effect May 18, 1985 and was terminated July 18, 1986,
after Tan attempted to present Waters Tan & Co. (his
business, which was eventually closed on grounds of
fraudulent inducement) as the IB covered by Miller's
guarantee. Several years later, individuals who had
invested in Waters Tan's trading pool between May 18,
1985 and July 18, 1986 filed a class action lawsuit, seeking
to hold Miller vicariously liable for their losses. In both
actions, the district court granted summary judgment in
Miller's favor, concluding (1) that the plaintiffs had not
become customers during the *effective* date of the Miller-
Tan guarantee agreement, and (2) that basic agency
principles belied the plaintiffs' assertion that the guaran-
tee agreement contemplated such responsibility on the
part of Miller. *Cunningham*, 65 F.3d at 1356, 1359.

Although admittedly, the facts of *Cunningham* do not
perfectly match the facts before us, this case was close
enough to land on both parties' "radars" because of its
temporal analysis of a guarantee agreement. Prestwick
maintains that *Cunningham* is significant because "the
Court held that an FCM could be liable for violations of
the CEA that occurred before the term of its guarantee
agreement since the 'obligation' analysis focuses on when
the account is opened."[12] Moreover, Prestwick argues,
*Cunningham* instructs that the timing of any misconduct

---

[12] Appellant Br. at 14.

concerning an account is "irrelevant" to the scope of the guarantee agreement. PFG rejoins that, in fact, our decision in *Cunningham* made it abundantly clear that timing of *all* alleged activities in analogous cases is dispositive. In our view, the following excerpt from *Cunningham* amply validates PFG's interpretation:

> [T]he contract can support no liability for alleged fraudulent activity that occurred after the termination date of the contract. Therefore, Miller cannot be liable for any activity that occurred after July 18, 1986. *The agreement was terminated at that point by mutual consent.* The language of the guarantee agreement that unambiguously provides "[t]ermination of this agreement will not affect the liability of the futures commission merchant with respect to obligations of the introducing broker incurred on or before the date this agreement is terminated," permits, under normal principles of contractual interpretation, no other interpretation.

*Cunningham*, 65 F.3d at 1359 n.7 (emphases supplied) (citing *Palda v. Gen. Dynamics Corp.*, 47 F.3d 872, 874 (7th Cir. 1995); *Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405, 1409 (7th Cir. 1994)). To be sure, the termination language in the *Cunningham* agreement is virtually identical to the comparable provision in the 2004 Guarantee Agreement. This is because Subsection (j)(7) of 17 C.F.R. § 1.10 also prescribes the term of guarantee agreements: "The termination of a guarantee agreement by a futures commission merchant, retail foreign exchange dealer or an introducing broker, or the expiration of such an agree-

ment, shall not relieve any party from any liability
or obligation arising from acts or omissions which
occurred *during the term of the agreement*." 17 C.F.R.
§ 1.10(j)(7) (emphasis supplied). Reading this regulation
in tandem with the 2004 Guarantee Agreement, PFG's
understanding of the scope of its guarantee is the only
viable one.

Months after the parties' oral arguments before our
court concerning the district court's construction of the
plain language of the 2004 Guarantee Agreement, we
still find Prestwick's position perplexing. Nothing within
the governing regulations or the "four corners of the
contract" remotely indicates that this agreement was to
continue in full force with respect to "existing accounts."
That Prestwick asks us to impute this intent into the
2004 Guarantee Agreement (or, for that matter, any of
the operative documents) is contrary to time-honored
principles of contract interpretation. *E.g.*, *Ambrosino v.
Rodman & Renshaw, Inc.*, 972 F.2d 776, 786 (7th Cir. 1992)
("[T]he principle that the written statement controls . . . is
a staple of contract law, and we agree . . . that it should
be used in securities law as well.") (citation omitted).
More importantly, Prestwick's interpretation of the
district court's summary judgment ruling is plainly
impracticable in the real world. Despite Prestwick's
ardent pronouncements that it does not consider the
2004 Guarantee Agreement a perpetual guarantee, we
fail to see how else to credit Prestwick's interpretation. At
bottom, Prestwick asks for a ruling that would leave
parties like PFG with no safety valve in unforeseen cir-
cumstances which would warrant backing out of a "done

deal." Such a result would be patently unreasonable and, in our judgment, legally incorrect.

Equally untenable is Prestwick's argument that the district court's misinterpretation of the 2006 IIB Agreement means the 2004 Guarantee Agreement was not terminated. Prestwick cites as error the district court's failure to conclude that the 2006 IIB Agreement excludes Prestwick by its terms. Prestwick asserts that the parties did not intend the 2006 IIB Agreement to end PFG's guarantee of Acuvest's obligations regarding Prestwick's Maxie account because the contract (1) defines "customer" as an entity that opens a "new" account with PFG or transfers an existing account from another FCM to PFG, and (2) "does not mention *existing* accounts."[13] Indeed, Prestwick argues that the "only conceivable" reconciliation of the 2004 Guarantee Agreement with the 2006 IIB Agreement is that the former governed accounts opened before August 24, 2006 and the latter covered those opened subsequently. But this is a step too far. The fact that the 2006 IIB Agreement covered new accounts does not prompt the inference that the 2004 Guarantee Agreement was not terminated. Nor does it in any way suggest that each contract governed a discrete series of transactions, as Prestwick asserts. To that end, Prestwick's reliance upon *In re TFT-LCD (Flat Panel) Antitrust Litigation*, Nos. M 07-1827 SI, C 10-5458 SI , 2011 WL 5325589, at *6 (N.D. Cal. Sept. 19, 2011), to support this claim is misplaced. Prestwick has attempted to

---

[13] Appellant Br. at 16.

No. 12-1232                                                29

analogize its circumstances to those present in *TFT-LCD* because both cases involve structurally similar agreements containing "boilerplate integration clauses." According to Prestwick, these contractual parallels indicate that the 2006 IIB Agreement "did not serve to modify . . . the rights and obligations of the parties under the 2004 Guarantee Agreement."[14] A closer look at Prestwick's citation, however, reveals convenient cherry-picking from the court's decision. Prestwick omits the fact that the *TFT-LCD* court actually held as follows:

> [T]he structure of the agreements suggests that each contract governed a discrete series of transactions; each has an explicit start point and end point, with no overlap between them. Given this structure, the Court sees nothing to indicate that the parties intended the integration clause to reach prior, *fully performed contracts*.

*In re TFT-LCD*, 2011 WL 5325589, at *6 (emphasis supplied). This excerpt from *TFT-LCD* makes clear that Prestwick's situation is, at the very least, distinguishable. More importantly, it does not weaken the district court's decision that the 2004 Guarantee Agreement was terminated in accordance with governing statutes and regulations. We therefore reject Prestwick's second argument on this issue as well.

Prestwick's third argument regarding termination of the 2004 Guarantee Agreement implicates our under-

---

[14] Appellant Br. at 19.

standing of public policy in the area of consumer protection. Prestwick apparently believes that CFTC regulations—and guarantee agreements executed thereunder—have different meanings based on brokers' actions after such agreements are terminated. It is unclear to us why Prestwick would consider this fair or sound policy. To the extent that good public policy means that someone must be liable in situations like these, we fail to see why the guarantor who properly terminated its relationship with a broker must be the party left "holding the bag." We are also mindful that, when making policy determinations, courts ought to employ "that approach [which] respects the words of Congress." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570 (7th Cir. 2012) (citing *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004)). And, as noted *supra*, Congress's words corroborate the premium it has placed on ensuring FCMs' accountability. Even so, Congress has also expressly disapproved of "impos[ing] vicarious liability on a futures commission merchant for the actions of an independent [broker]." S. REP. NO. 97-384, at 41. Our examination of the CEA's legislative history likewise reveals that Prestwick's policy arguments simply do not hold water.

Both the 2004 Guarantee Agreement and the 2006 IIB Agreement clearly permitted PFG to close any account at any time for any or no reason. These provisions harmonize not only with the common-law precept that parties may craft agreements indicating the circumstances in which they will accept liability, but also with the statutory and regulatory scheme of the CEA. Prestwick's argument to the contrary overlooks two important ob-

jectives of FCM liability: first, to ensure FCMs' supervision of their brokers; and second, to safeguard customers by confirming that their *current* FCM meets the required level of financial resources. Here, these policy considerations make it reasonable to conclude that Acuvest's job of "inviting" investment warranted some sort of extra protection to avoid luring investors to trade under false pretenses. These protections reflect that a guaranteed IB is free of the reporting constraints imposed upon an independent IB when conducting business. Without the assurance provided by such financial reports, the best way to ensure a non-independent IB's economic viability is to require it to sign a binding guarantee agreement as "an important element of customer protection." *See* 48 Fed. Reg. at 14,942. Once an entity like Acuvest can meet the required financial benchmarks (and has terminated a guarantee agreement to indicate its status), the only logical conclusion is that its former FCM is divested of direct supervisory authority. To that end, the following NFA rules provide additional convincing support for our conclusion that PFG is not "on the hook" for any alleged fraud in this case:

(1) NFA Rule 2-23 provides: "Any Member FCM . . . which enters into a guarantee agreement . . . with a Member IB, shall be jointly and severally subject to discipline under NFA Compliance Rules for acts and omissions of the Member IB which violate NFA requirements occurring during the term of the guarantee agreement;"

(2) NFA Rule 2-9 provides: "Each Member [FCM] shall diligently supervise its employees and agents in the conduct of their commodity futures activities for or on behalf of the Member," and the interpretive notice accompanying promulgation of this rule notes that "Rule 2-9 . . . imposes a direct duty on guarantor FCMs to supervise the activities of their guaranteed IBs;" and

(3) Sections 5 and 6 of the NFA's Arbitration Code refer to "the Member FCM . . . that guaranteed the IB during the time of the acts and transactions involved in the claim" when setting forth arbitration requirements for customers.

According to PFG, these NFA rules give FCMs "the responsibility, and hence the authority, to supervise" the guaranteed IB, but "[o]nce the guarantee agreement has been terminated, the FCM no longer has the authority to force this independent legal entity to conform its conduct to the FCM's requirements." Prestwick's most compelling rejoinder is that this argument undercuts a major goal of the CEA and its attendant rules: protecting IBs' customers. Unfortunately, Prestwick has overlooked the fact that *Maxie* was the "customer" in this situation, and Maxie voluntarily gave up its right to complain long ago. Thus, to the extent that this lawsuit was really Maxie's, that proverbial ship has sailed. We are, of course, sympathetic to the plight of investors, like Prestwick, who may have no idea when a guarantee relationship is severed. Although some due diligence must be expected, we understand that a few weeks may

elapse after guarantee termination wherein investors cannot protect themselves from the actions of unguaranteed brokers. This can certainly be an unfortunate result, but it does not authorize us—or even permit us—to require FCMs to close all accounts opened during the term of a severed guarantee agreement with an IB and then reopen those accounts if a new guarantee arises. There is simply no evidence that Congress, through the CEA, intended to place such a burden on FCMs. Thus, despite our sense that the well-being of investors ought to be considered in some fashion in these cases, perhaps by recognizing a right to notice of the end of the guarantee agreement (which would enable the investor to take appropriate self-protective steps), the courts are not the proper place to impose new regulatory requirements.

No policy arguments can overcome the simple fact that the contracts at issue in this lawsuit are definitive. Consequently, we reiterate our well-settled view that this court is "not in the business of rewriting contracts to appease a disgruntled party unhappy with the bargain it struck." *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 893-94 (7th Cir. 2004). Fairness aside, we are unwilling to resolve a legislative issue through a ruling that would contravene the CEA and established common-law contract rules. Guarantee agreements would simply make no sense if they required parties to look back in time for some FCM that might well be insolvent or no longer in existence. Prestwick's policy arguments, therefore, are untenable in our current legislative and regulatory atmosphere. Although Prestwick may have

legitimate grounds to challenge this framework, the place to do so is not before the courts. We therefore reject Prestwick's appeal to public policy to defeat the district court's decision that the 2004 Guarantee Agreement was properly terminated.

### B. Equitable Estoppel

Courts applying Illinois law will generally entertain arguments grounded in equitable estoppel in situations "where a person by his or her statements and conduct leads a party to do something that the party would not have done," thereby placing the other party in a worse position. *Maniez v. Citibank, F.S.B.*, 937 N.E.2d 237, 245 (Ill. App. Ct. 2010) (quoting *Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001)). If a party prevails on such a theory, the other person "will not be allowed to deny his or her words or acts to the damage of the other party." *Geddes,* 751 N.E.2d at 1157. First, however, the party asserting this highly fact-sensitive claim must demonstrate: (1) misrepresentation or concealment of material facts; (2) the other party's knowledge that the representations were false when made; (3) the claimant's lack of knowledge of such falsity; (4) the other party's expectation of the claimant's subsequent action; (5) the claimant's reasonable, good faith, detrimental reliance on the misrepresentations; and (6) the likelihood of prejudice to the claimant if the other party is not equitably estopped. *See id.* Establishing reasonable reliance is paramount among these elements. *See e.g., Hentosh v. Herman M. Finch Univ. of Health Scis. / Chi. Med. Sch.,* 167

F.3d 1170, 1174 (7th Cir. 1999) (grant of equitable estoppel "should be premised on . . . improper conduct as well as . . . actual and reasonable reliance thereon"); *Wheeldon v. Monon Corp.*, 946 F.2d 533, 537 (7th Cir. 1991) (same); *see also John Hancock Life Ins. Co. v. Abbott Labs.*, 478 F.3d 1, 11 (1st Cir. 2006) (applying Illinois law of equitable estoppel and noting that the other party must "reasonably rel[y] on that conduct to its detriment").

Prestwick's cursory exploration of this issue is not *per se* fatal to its claim. However, its continued failure to present clear facts regarding affirmative misrepresentations by PFG dooms the issue on appeal. The district court considered Prestwick's vague description of PFG's "misrepresentation" that "Acuvest was guaranteed by PFG, a much larger financial institution," *Prestwick Capital Mgmt. Ltd.*, 2011 WL 3796740, at *4, entirely off the mark, and we agree. Oddly enough, the fact that PFG *was* Acuvest's guarantor for the time periods memorialized in the NFA database means the above allegation is itself a misrepresentation. Any statements made by PFG during these months indicating its guarantee of Acuvest's obligations would be wholly appropriate, if not expected. Additionally, though Prestwick's argument for including the parties' course of conduct in an equitable estoppel analysis is well taken, it is clear that such inquiry was impracticable because of gaps in the record. We have reviewed the same evidence and feel as woefully unequipped as the district court to identify what, precisely, about PFG's conduct might render it a sanctionable misrepresentation. Likewise, we remind Prestwick that "summary judgment is not a paper trial,

[and] the district court's role in deciding the motion [was] not to sift through the evidence, pondering the . . . inconsistencies" before deciding whom to believe. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In a misguided attempt to salvage its summary judgment brief, Prestwick sought the district court's permission to conduct additional discovery. *See* Fed. R. Civ. P. 56(d)(2) (discussing a court's prerogative to allow extra time to take discovery "[i]f a non[-]movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition"). Prestwick asserted that a supplementary deposition of Cory Dosdall—one of Prestwick's managers when the conduct giving rise to this lawsuit occurred—would yield essential facts concerning both representations and reliance. According to Prestwick, Dosdall's testimony would reveal that Prestwick's decision to invest in Maxie through Acuvest was contingent upon Acuvest's representation to Dosdall that PFG was guaranteeing Acuvest's obligations. Prestwick also hoped to demonstrate that Dosdall believed the 2004 Guarantee Agreement "was always in place"[15] and that Dosdall would have immediately withdrawn Prestwick's funds if he had realized that the 2004 Guarantee Agreement was terminated or that it could be terminated at any time by PFG. Nonetheless, the district court

---

[15] Docket No. 157-1 (declaration by Philip M. Smith, counsel for Prestwick).

deemed such discovery unnecessary and denied Prest-wick's request.

Our review of a district court's discovery rulings is extremely deferential; we will reverse such rulings only for an abuse of discretion. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004). Unless "(1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary," the district court has not abused its discretion. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). None of the foregoing factors militate in favor of reversal of this discovery ruling. In our view, the district court's decision reflects proper, reasoned application of Illinois law regarding equitable estoppel to the evidence of record. Further, the court's careful consideration of the parties' discovery behavior, as evinced by the comment that the court was "given pause by PFG's lack of cooperation in the discovery process," satisfies us that this ruling was in no way arbitrary.

We note that the district court's explanation for rejecting further discovery is succinct, but we find no fault with its substance. The record is replete with evidence counseling against Prestwick's equitable estoppel claim, and Prestwick's eleventh hour discovery request would not have sealed the logical cracks in its argument. To be sure, deposing Dosdall would have developed the record as to representations made by Acuvest to an agent of Prestwick and, presumably,

Prestwick's reliance upon these representations. But Dosdall's testimony could only be deemed "essential" to Prestwick's position on equitable estoppel if it could establish that *PFG* had made the purported representations. Prestwick has merely argued that, at some point between 2005 and 2006, *Acuvest* assured Dosdall of its status as a guaranteed IB and that PFG was the guarantor. Even coupled with the statement that "Dosdall relied completely on Acuvest to communicate all material aspects of [Prestwick]'s investments," this contention does not support the result Prestwick seeks, *i.e.*, a finding that PFG should be equitably estopped from arguing that it terminated the 2004 Guarantee Agreement. This is because facts about Acuvest's purported representations (and Prestwick's reliance upon them) have no bearing on the outcome of an equitable estoppel claim against PFG under the governing law and, accordingly, are not "material facts." *See Anderson*, 477 U.S. at 248.

Moreover, although the district court did not include this finding, we pause to mention that any reliance Prestwick had hoped to establish via Dosdall's deposition would not have been reasonable. Specifically, Dosdall was expected to testify that he would have made different investment choices on Prestwick's behalf if he had known that PFG could unilaterally terminate the 2004 Guarantee Agreement (or, of course, that PFG did terminate the agreement). The problem with this contention is that it is belied by evidence in several documents of record. One such document, the "Confidential Offering Memorandum" for prospective limited partners, was provided to Prestwick prior to its investment in

Maxie. This memorandum listed PFG and another entity as potential clearing firms, but it did not cite a specific guarantee relationship between these firms and brokers like Acuvest. The memorandum also plainly invited prospective investors "to review any materials available to the General Partner[, Maxie,] relating to the Partnership." Critically, the memorandum authorized Maxie—and *only* Maxie—to determine the broker for all trading activities, giving Maxie "the right, in its sole discretion, to change the Partnership's brokerage and custodial arrangements *without further notice to limited partners*." Maxie's Limited Partnership Agreement, to which Prestwick willingly became a party, likewise gave Maxie sole management rights—with no caveats regarding notice provisions to limited partners. Finally, Dosdall's signature on Maxie's "Subscription Agreement" bespeaks Prestwick's[16] acknowledgment that Prestwick had "made an investigation of the pertinent facts" concerning the Maxie transaction and was "fully informed with respect thereto." The foregoing evidence makes clear that Prestwick's lack of knowledge claim is baseless. Given so many opportunities to investigate the Maxie arrangement, for Prestwick now to claim it did not know a guarantee agreement could be terminated is disingenuous

---

[16] We impute this knowledge and conduct to Prestwick because Dosdall, signing on behalf of Prestwick, had obtained his knowledge of the cited documents while acting in the scope of his agency. Presumably, he reported this information to his corporate principal. *United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992).

and contrary to law, and it certainly does not establish reasonable reliance.

We recognize, of course, that transacting business when one party may unilaterally terminate a contract may pose difficulties. From Prestwick's perspective, PFG's decision to terminate the 2004 Guarantee Agreement  may well have struck a silent blow. And, under Illinois law, a cognizable claim for equitable estoppel may arise "from silence as well as words. It may arise where there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent." *Hahn v. Cnty. of Kane*, No. 2-12-0660, 2013 WL 2370565, at *3 (Ill. App. Ct. May 31, 2013) (citations omitted). Nevertheless, Prestwick has alleged no special relationship between itself and PFG which would foist an affirmative duty on PFG to notify investors of changes to its various broker relationships. This argument would, in any event, be unavailing because the law to be applied to the facts before us establishes no such duty on behalf of PFG. *See Marks v. Rueben H. Donnelley, Inc.*, 636 N.E.2d 825, 832 (Ill. App. Ct. 1994) ("[E]quitable estoppel cannot be based on a party's silence unless that party had an affirmative duty to speak."). PFG's conduct comported with both Illinois law and the regulatory system effected by Congress—a system which, we note once more, we are not at liberty to revise. As a result, PFG's entitlement to summary judgment on this issue stands.

## IV. CONCLUSION

Having DENIED PFG's motion to dismiss the instant appeal, we likewise reject its contention that summary judgment for PFG was improper. For the foregoing reasons, we AFFIRM the judgment of the district court in favor of PFG.